


THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Sheri H. Mecklenburg (312) 469-6030
AUSA Kelly Guzman (312) 353-1598

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HEATHER BERGDAHL

CASE NUMBER: 24 CR 232

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about December 2, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 United States Code Sections 666 and 2 | Embezzled, stole, obtained by fraud, and otherwise without authority knowingly converted to the use of any person other than the rightful owner, property that was valued at $5,000 or more and owned by a federally funded program |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

Christopher Seidel by MV
Christopher Seidel
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 10, 2024

Maria Valdez
*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

**AFFIDAVIT**

I, Christopher Seidel, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately November 2019. As part of my duties as a FBI Special Agent, I investigate criminal violations relating to financial crimes, including fraud, embezzlement, and money laundering. I have participated in the execution of multiple federal search warrants and arrest warrants.

2. This affidavit is made in support of a criminal complaint alleging that, on or about December 2, 2021, Heather BERGDAHL (BERGDAHL), being an agent of federally funded program that received, in any one year period, in excess of $10,000, embezzled, stole, obtained by fraud, and otherwise without authority knowingly converted to the use of any person other than the rightful owner, property that was valued at $5,000 or more and owned by such federally funded program, in violation of Title 18, United States Code, Sections 666.

3. The statements in this affidavit are based on my personal knowledge, on information I have received from other law enforcement personnel, on information received from persons with knowledge regarding relevant facts, and on my or other law enforcement agents' review of records including emails, subpoenaed business records, bank records, cell phone records, and public records. Because this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not

included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that from June 2021 through December 2021, Heather BERGDAHL committed the offense alleged in the complaint.

## I. FACTS SUPPORTING PROBABLE CAUSE

4. As discussed below, the Federal Bureau of Investigation and the U.S. Department of Health and Human Services, Office of Inspector General have obtained evidence that, between June and December 2021, BERGDAHL and a former high-level employee of Hospital A (Individual A) embezzled and stole approximately $486,540 through the unauthorized issuance of at least 11 Hospital A checks made payable to entities created by Individual A, which checks were issued by BERGDAHL and were thereafter deposited or caused to be deposited into bank accounts that Individual A controlled. The evidence shows that, in fact, Individual A's entities did not provide any goods or services to Hospital A that would justify such payments and that BERGDAHL issued these funds to Individual A, and Individual A took these funds, both knowing that the funds had been embezzled from the hospital.

### A. Key Individuals and Entities

#### 1. Hospital A

5. Hospital A is a small hospital located on Chicago's west side. According to its website and interviews with Individual B, the current Chief Financial Officer at Hospital A who, among other duties, oversees all financial matters, Hospital A functions as a non-profit safety net hospital, meaning that it provides medical care to

a low-income community, and accepts patients regardless of whether a patient is insured. Hospital A receives, in any one year period, including in the year 2021, more than $10,000 from Federal programs, including Medicaid and Medicare.

**2. Individual A**

6. According to public records, Hospital A records and Individual B (who worked at Hospital A at the same time as Individual A), Individual A is a medical doctor who was hired by Hospital A in or around November 2017, while still in his medical residency. In or around December 2017, Individual A obtained his medical license and, shortly thereafter, Hospital A appointed Individual A as Chief Operating Officer ("COO"). In January 2018, Hospital A entered into an agreement with Individual A that effective July 2018, Individual A would be Hospital A's Chief Financial Officer ("CFO") in addition to COO.

7. According to documents produced by Hospital A and interviews of members of Hospital A's Board of Trustees, on or about March 24, 2021, Individual A resigned from employment with Hospital A, on the same day that the Hospital A Board of Trustees voted to terminate Individual A's employment for engaging in the unauthorized distribution of COVID-19 vaccines through Hospital A.

**3. Heather Bergdahl**

8. According to Hospital A records and Individual B, Individual A hired BERGDAHL on or about February 23, 2022 to be the Chief Transformation Officer at Hospital A, handling outreach for screening and COVID-19 testing and vaccines. In addition, BERGDAHL supervised Accounts Payable at Hospital A, and

BERGDAHL's responsibilities at Hospital A included reviewing and approving invoices and bills for payment; paying invoices and bills; requesting, generating, issuing and printing checks for payment for goods and services; and processing credit card payments for goods and services. Through her position, BERGDAHL was able to enter vendors into Hospital A's Meditech system (which kept track of vendor information, including payments to vendors), request and approve payments to vendors, and print checks.

9. According to Individual C (a former employee of Hospital A who worked closely and had a personal friendship with BERGDAHL), it appeared that BERGDAHL knew Individual A before he hired her, when they both lived in Houston, because BERGDAHL would talk about how she knew Individual A and their relationship appeared more personal than recently acquainted co-workers.

10. BERGDAHL ceased being an employee of Hospital A in March 2022, continuing duties on behalf of Hospital A as a contractor, until on or about April 12, 2022, when Hospital A terminated its relationship with BERGDAHL.

11. According to Individual C, BERGDAHL performed tasks at Individual A's direction during their mutual employment at Hospital A and they were in regular contact multiple times a day, every day, including after hours.

**B. BERGDAHL Embezzled Funds From Hospital A**

12. Between approximately June and December 2021, after Individual A's employment with Hospital A had ended, and while BERGDAHL still worked at Hospital A, BERGDAHL issued approximately $486,540 in checks drawn on a

Hospital A bank account and made payable to entities for which Individual A was the purported CEO. Individual A deposited these checks into bank accounts that he had opened in the names of these purported entities and then quickly transferred the money to other bank accounts that he controlled. According to representatives of Hospital A, none of the purported entities did business with, or provided goods or services to, Hospital A.

**1. Individual A Opens Bank Accounts in the Names of the Individual A Entities and On the Same Day BERGDAHL Starts Issuing Checks Made Payable to Those Entities**

13. According to Bank of America (BOA) records:

a. On or about June 11, 2021, Individual A opened four business bank accounts in the name of "Gold Oak Capital Inc." ("Gold Oak"),[1] each using a different "doing business as" (d/b/a) entity name, namely, Medlabs USA, Chicago Promotions Ltd., Illinois Biotech Co., and Midwest Medical Supplies (together, the "Individual A Entities").

b. These accounts included: (a) an account ending in 2758 opened in the name of Gold Oak d/b/a Medlabs USA (the "Medlabs 2758 Account"); (b) an account ending in 0103 opened in the name of Gold Oak d/b/a Chicago Promotions Ltd (the "Chicago Promotions 0103 Account"); (c) an account ending in 1584 opened

[1] According to Texas Secretary of State records, on or about August 7, 2020, Individual A registered Gold Oak with the Texas Secretary of State, listing Individual A as the sole individual associated with the company. On or about August 20, 2020, Individual A opened two bank accounts at Bank of America (BOA) both in the name of Gold Oak, respectively ending in 08845 and 08874. Individual A was the sole signature on each Gold Oak Account. According to Individual B and Hospital A records, Hospital A did not do any business with Gold Oak.

in the name of Gold Oak d/b/a Illinois Biotech Co. (the "Illinois Biotech 1584 Account"); and (d) an account ending in 8914 opened in the names of both "Gold Oak Capital, Inc." and "Midwest Medical Supplies" (the "Midwest Medical 8914 Account").

c. Each account listed Individual A as "CEO" of the Individual A Entity and the sole signor on the account. Each account was opened using an address on the 400 block of N. Wabash Avenue in Chicago, which, according to public records and interviews of individuals who worked at that property, was Individual A's residence at the time the bank accounts were opened. In or around November 2021, the address on each account was changed to an address on the 1600 block of Post Oak Blvd in Houston, Texas, which, according to public records, was a condominium owned by Individual A at that time.

14. Based on my training, experience, and familiarity with this case – including the manner in which Individual A subsequently used these bank accounts, the timing of BERGDAHL's issuance of Hospital A checks made payable to the Individual A Entities (discussed below), and the absence of any records related to these purported businesses beyond these bank accounts (discussed below) – I believe that BERGDAHL issued these checks using these d/b/a names to conceal the fact that Individual A, who recently had left Hospital A, was the true intended recipient of the checks, and that Individual A opened the bank accounts using the d/b/a names to conceal that Individual A was the intended recipient of the subsequently issued Hospital A checks, with both knowing that those proceeds belonged to Hospital A and that Individual A was not entitled to those proceeds.

**2. BERGDAHL Generates Over $486,000 in Hospital A Checks Made Payable to the Individual A Entities, Which Did No Business with Hospital A**

15. According to Hospital A records, on June 11, 2021 – the same day that Individual A opened bank accounts in the names of the Individual A Entities – BERGDAHL caused Hospital A to begin issuing checks made payable to the Individual A Entities. Four of those checks, totaling approximately $314,888.96, were issued in the four days after Individual A opened the Individual A Entity bank accounts, including one issued the very same day and another issued the day after. In total, between June 11, 2021, and November 29, 2021, BERGDAHL caused Hospital A to issue 11 checks made payable to the Individual A Entities, for a total of approximately $486,540.28, including:

a. on June 11, 2021, a check for approximately $149,999.99 made payable to Medlabs USA;

b. on June 12, 2021, a check for approximately $29,999.99 made payable to Chicago Promotions;

c. on June 15, 2021, a check for approximately $79,999.99 made payable to Illinois Biotech;

d. on June 15, 2021, a check for approximately $54,888.99 made payable to "Midwest Med";

e. on August 23, 2021, a check for approximately $15,082.60 made payable to Medlabs USA;

f. on August 23, 2021, a check for approximately $29,999.99 made payable to Chicago Promotions;

g. on August 23, 2021, a check for approximately $13,999.98 made payable to Illinois Biotech;

h. on November 29, 2021, a check for approximately $31,866.78 made payable to Medlabs USA;

i. on November 29, 2021, a check for approximately $29,999.99 made payable to Chicago Promotions;

j. on November 29, 2021, a check for approximately $27,825.99 made payable to Illinois Biotech; and

k. on November 29, 2021, a check for approximately $22,875.99 made payable to Midwest Medical Supplies.

16. According to Individual B, based on a search of hospital records, Hospital A has no records, orders, invoices, bills, delivery receipts, or correspondence documenting receipt of any goods or services from any of the Individual A Entities. According to a review of Hospital A records, as well as interviews of Individual B, and further interviews on or about February 22, 2024 of Hospital A's Materials Manager (who has worked at Hospital A for years and is familiar with the vendors of Hospital A), and Hospital A's Marketing Manager (who has worked at Hospital A for years and is familiar with vendors associated with promotions or marketing), none of the Individual A Entities are vendors of Hospital A.

17. According to Hospital A's computer system and records, known as the Meditech system, BERGDAHL:

a. generated and issued each of eleven checks made payable to the Individual A Entities;

b. issued each check without submitting a requisition form identifying BERGDAHL as the check requestor; and

c. issued each check without submitting a bill, invoice, or other proof of a transaction requiring payment.

18. According to Individual B, BERGDAHL generated the checks to the Individual A Entities in a manner inconsistent with the hospital's ordinary course of business. Specifically, according to Individual B:

a. Whereas BERGDAHL issued each payment to the Individual A Entities without submitting a requisition form identifying her as the check requestor, Hospital A employees responsible for processing payments submitted such requisition forms in the ordinary course of business so that Hospital A will have a record of who requested payment, the vendor, the department associated with the payment and the subaccount at the hospital associated with the payment, for internal accounting and accountability purposes.

b. Whereas BERGDAHL issued each check without submitting a bill, invoice, or other proof of a transaction requiring payment, Hospital A employees responsible for processing payments submitted such documentation in the ordinary course of business so that the hospital would have a record documenting the goods or services provided by the vendor, and thus justifying the payment.

19. According to BOA bank records, between June 2020 and January 10, 2022, while BERGDAHL was employed at and receiving a salary from Hospital A, and was not known to be working for Individual A, BERGDAHL received payments from Individual A's two original Gold Oak accounts totaling more than $419,000. Specifically:

a. In 2020, Individual A made payments to BERGDAHL from the Gold Oak accounts in the total amount of $20,952, consisting of four payments — $10,000 on June 1, 2020, $5,000 on October 2, 2020, $5,000 on October 5, 2020 and $952 on October 13, 2020.

b. In 2021 and continuing into early January 2022, during the approximate time of the embezzlement described in this Affidavit, Individual A made payments to BERGDAHL from the Gold Oak accounts in the amount to $398,560, approximately 20 times the amount Individual A gave to BERGDAHL in 2020, consisting of eight payments (double the number of payments he gave to BERGDAHL in 2020) — one on May 26, 2021, one in June 2021, two in July 2021, two in August 2021, one in September 2021 and one in January 2022, all from the Gold Oak account.

c. Starting on May 26, 2021, Individual A increased the payments to BERGDAHL both in frequency and amount. Whereas, in 2020, Individual A had paid BERGDAHL $20,952 with the last payment on October 13, 2020, and then nothing from October 13, 2020 through May 26, 2021, Individual A paid BERGDAHL large sums on an almost monthly basis during the time surrounding the

embezzlement, starting with a payment of $40,560 on May 26, 2021, a payment of $75,000 on June 16, 2021, a payment of $13,000 on July 6, 2021, a payment of $79,000 on July 26, 2021, two payments, $75,000 and $10,000, on August 18, 2021, a payment of $81,000 on September 23, 2021, and a payment of $25,000 on January 10, 2022.[2]

20. Based on my training, experience, and familiarity with this investigation – including records obtained from Hospital A and BOA, as well as information from current and former Hospital A employees – I believe that BERGDAHL embezzled, and without authority knowingly converted to Individual A, approximately $486,540 in Hospital A money by issuing at least 11 checks made payable to the Individual A Entities, which BERGDAHL knew had not provided any goods or services to the hospital to justify such payments.

**3. Individual A Receives and Deposits Over $486,000 in Hospital A Checks Which BERGDAHL Caused To Be Issued and Made Payable to the Individual A Entities, Knowing Those Entities Did Not Provide Any Goods or Services to Hospital A**

21. According to Verizon records, between June 1, 2021 and December 31, 2021 – the period in which BERGDAHL issued and Individual A received and deposited the 11 Hospital A checks made payable to the Individual A Entities – a

[2] The January 10, 2022 payment is the last payment from Gold Oak to Individual A. Although documents produced by Anosh, Inc. and other entities show that Individual A performed work starting in 2022 at AHMED's COVID-19 testing sites in Texas, and subsequently at his Texas laboratories, AHMED did not pay Individual A for this work from the Gold Oak accounts.

phone used by Individual A ("Individual A Phone 1")[3] had approximately 340 telephonic contacts with a phone used by BERGDAHL ("BERGDAHL Phone 1").[4] Between June 10, 2021, and June 15, 2021 – when the initial Individual A Entity checks were first issued and deposited and the bank accounts were opened – Individual A Phone 1 and BERGDAHL Phone 1 had 40 contacts with each other. During those five days, BERGDAHL Phone was the phone number with the fifth most frequent contacts with Individual A Phone 1. Based on my training, experience, and familiarity with this case, I believe that, during those calls, BERGDAHL and Individual A planned and coordinated BERGDAHL's embezzlement of Hospital A funds by way of checks made payable to the Individual A Entities, and Individual A's opening of bank accounts in the names of those entities to receive those funds.

[3] Agents identified Individual A as the user of Individual A Phone 1 as follows: According to records from Verizon, Individual A Phone 1 was registered to Individual A on June 27, 2015. Individual B used Individual A Phone number on multiple occasions in 2021 to communicate with Individual A. According to a database that, in my experience, analyzes numerous records from various data sources, including financial and governmental institutions, to provide accurate identifying information regarding individuals ("Records Database"), Individual A was identified as the user of Individual A Phone 1.

[4] The T Mobile records showed the BERGDAHL phone number was not registered solely in the name of BERGDAHL, but did not disclose to whom the phone number was registered. Individual B used the Individual A phone number on multiple occasions in 2021 to communicate with BERGDAHL. According to the Records Database, from August 2014 through August 2023, BERGDAHL Phone was associated with BERGDAHL and, prior to that time, with another individual who shares the same last name as BERGDAHL and who, based on an internet search, appears to be BERGDAHL's father. In addition, in a February 3, 2021 email produced by Hospital A, sent by the email address assigned by Hospital A to BERGDAHL, BERGDAHL identified her mobile phone number as BERGDAHL Phone number, stating to the recipient, "My cell phone number is [BERGDAHL Phone]."

22. According to BOA records, each of the aforementioned checks was deposited into one of the four bank accounts held in the name of the Individual A Entities. Five of those checks were deposited on the same day that they were issued, five of those checks were deposited within three days after being issued, and one check was deposited within a week of being issued. As noted above, Individual A held sole control over each of these bank accounts. Specifically:

a. the June 11, 2021 check to Medlabs USA for $149,999.99 was deposited into Individual A's Medlabs 2758 Account on June 14, 2021 – less than three days after BERGDAHL issued that check;

b. the June 12, 2021 check to Chicago Promotions for $29,999.99 was deposited into Individual A's Chicago Promotions 0103 Account on June 14, 2021 – two days after BERGDAHL issued that check;

c. the June 15, 2021 check to Illinois Biotech for $79,999.99 was deposited into Individual A's Illinois Biotech 1584 Account on June 15, 2021 – the same day that BERGDAHL issued that check;

d. the June 15, 2021 check to "Midwest Med" for $54,888.99 was deposited into Individual A's Midwest Medical 8914 Account on June 15, 2021 – the same day that BERGDAHL issued that check;

e. the August 23, 2021 check to Medlabs USA for $15,082.60 was deposited into Individual A's Medlabs 2758 Account on August 23, 2021 – the same day that BERGDAHL issued that check;

f. the August 23, 2021 check to Chicago Promotions for $29,999.99 was deposited into Individual A's Chicago Promotions 0103 Account on August 23, 2021 – the same day that BERGDAHL issued that check;

g. the August 23, 2021 check to Illinois Biotech for $13,999.98 was deposited into Individual A's Illinois Biotech 1584 Account on August 23, 2021 – the same day that BERGDAHL issued that check;

h. the November 29, 2021 check to Medlabs USA for $31,866.78 was deposited into Individual A's Medlabs 2758 Account on November 30, 2023 – one day after BERGDAHL issued that check;

i. the November 29, 2021 check to Chicago Promotions for $29,999.99 was deposited into Individual A's Chicago Promotions 0103 Account on December 1, 2021 – two days after BERGDAHL issued that check;

j. the November 29, 2021 check to Illinois Biotech for $27,825.99 was deposited into Individual A's Illinois Biotech 1584 Account on December 2, 2021 – less than three days after BERGDAHL issued that check; and

k. the November 29, 2021 check for approximately $22,875.99 made payable to Midwest Medical Supplies was deposited into Individual A's Midwest Medical 8914 Account on December 6, 2021 – approximately one week after BERGDAHL issued that check.

23. Each of the checks described above had two signatures on the payor line, which signatures appeared to be those of Individual A and the then-CEO of Hospital A. At the time that each of these checks was issued, however, Individual A was no

longer employed by Hospital A and had no authority to sign or authorize any checks on the hospital's behalf, and BERGDAHL knew that Individual A was no longer employed by Hospital A and had no authority to sign or authorize any checks on the hospital's behalf.

24. On or about March 15, 2024, the Affiant conducted an on-line search for information related to each of the four Individual A Entities and found no records to show that these are now, or were in 2021, legitimate businesses. There are no records of these businesses other than the bank records. There were no business registrations for these businesses with the Texas Secretary of State or the Illinois Secretary of State. There was no website or other on-line presence for any of these businesses.

25. The bank records of the accounts held in the names of the Individual A Entities do not document any financial transactions that suggest legitimate business activity. The source of almost all funds in each of the four Individual A Entity bank accounts consisted of the Hospital A checks, with a small additional amount coming from a transfer of funds from another bank account controlled by Individual A and held in the name of a separate Individual A-controlled entity. After the last of the Hospital A checks were deposited in December 2021, there was no further activity in the Individual A Entity bank accounts.

26. Based on my training and experience, the absence of business registrations and the absence of a website or online presence, and the lack of any regular banking transactions, such as other payments or paying bills, indicates that these entities were not legitimate businesses.

27. Based on my training and experience, there are additional indicators suggesting that BERGDAHL unlawfully issued and Individual A unlawfully obtained these Hospital A made payable to the Individual A Entities without providing any legitimate goods or services. Specifically:

a. The first check issued to each of the four Individual A Entities was issued on either the same day, the day after, or no more than four days after Individual A first created the DBA entity on the bank records, and thus the purported entity would not have had time to provide any legitimate business, such as supplying goods or services, to Hospital A, justifying payment, let alone thousands of dollars-worth of business;

b. The dates of the checks are clustered on the same day or within a day or two of each other, which means that each of the Individual A Entities would have had to have conducted their individual business transactions with Hospital A on the same time schedule, i.e., obtaining, delivering and billing at the same time, within a short time frame (e.g., months rather than an annual bill);

c. Five of the checks issued to each entity were deposited in Individual A's bank accounts on the same day that the check was issued. Five of the other checks were deposited within three days of issue and the last check was deposited within a week. The timing of these deposits in relation to the issuance of each check suggests that Individual A and BERGDAHL coordinated their conduct, specifically suggesting that Individual A had told BERGDAHL about the entities and bank accounts around the time that they were opened, that there was not sufficient

time for the checks to go through the mail so that BERGDAHL either hand delivered the checks to Individual A or someone designated by Individual A, or deposited them directly into the accounts identified and as directed by Individual A.

28. Based on my training, experience, and familiarity with this investigation – including the aforementioned evidence showing that BERGDAHL issued over $486,000 in Hospital A checks made payable to companies that did not do business with the hospital (the Individual A Entities); that there were no invoices, bills, orders or other documents showing that any amounts were due from Hospital A to Individual A or the Individual A Entities; that the Individual A Entities have no business registrations, no website or online presence, and no record of any regular banking transactions, and thus do not appear to be legitimate businesses; that Individual A opened bank accounts, which he solely controlled, in the names of those same companies, and did so on the same day that BERGDAHL first began issuing checks made payable to those companies; that Individual A or someone acting on his behalf deposited those checks on the same day or within days of their issuance into the Individual A Entity bank accounts; and that Individual A, within less than 30 days of their deposit, moved those proceeds to other accounts that he exclusively controlled – I believe that:

a. Individual A opened each of the Individual A Entity accounts on June 11, 2021, for the purpose of receiving proceeds of BERGDAHL's embezzlement of funds from Hospital A, and thus coordinated the payment of those funds with BERGDAHL;

b. BERGDAHL and Individual A knew that neither Individual A nor the Individual A Entities had provided any goods or services to Hospital A that would justify the issuance of the checks made payable to the Individual A Entities or any other payments from Hospital A, and that he was not entitled to any of those funds;

c. BERGDAHL had, by issuing the checks made payable to the Individual A Entities, embezzled those funds from Hospital A and Individual A knew that BERGDAHL had, by issuing the checks made payable to the Individual A Entities, embezzled those funds from Hospital A;

d. the only way that BERGDAHL could have known of the Individual A Entities and their corresponding bank accounts so quickly after they were first created, and where and to whom to tender Hospital A checks made payable to those entities, was through communications with Individual A; and

e. by arranging for and accepting those proceeds, including through his expeditious movement of the money between accounts that he alone controlled, Individual A knowingly and unlawfully took money from Hospital A without providing any goods or services to justify the payments.

## II. CONCLUSION

29. Based on the above information, I respectfully submit that there is probable cause to believe that, on or about December 2, 2021, Heather BERGDAHL embezzled, stole, obtained by fraud and otherwise without authority knowingly converting to the use of any person other than the rightful owner, property that was

valued at $5,000 or more and owned by such federally funded program, in violation of Title 18, United States Code, Sections 666.

FURTHER AFFIANT SAYETH NOT.

Christopher Seidel by MV

Christopher Seidel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 10th day of May, 2024.

Honorable Maria Valdez
United States Magistrate Judge