

FILED
10/10/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:24-cr-00232
Judge Robert W. Gettleman
Magistrate Judge Maria Valdez
CAT. 3

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 24 CR 232 |
| v. | Judge Robert W. Gettleman |
| ANOSH AHMED,<br>SAMEER SUHAIL,<br>HEATHER BERGDAHL, and<br>GEORGE MILLER, JR. | Violations: Title 18, United States Code, Sections 666(a)(1)(A), 666(a)(1)(B), 666(a)(2), 371, 1343, 1956(a)(1(B)(i), and 2, and Title 26, United States Code, Section 7206(1)<br><br>Second Superseding Indictment |

## COUNTS ONE THROUGH FOURTEEN

The SPECIAL JANUARY 2023 GRAND JURY charges:

1. At times material to the indictment:

    a. Hospital A was a hospital in Chicago, Illinois, that received, in any one year period, including from at least 2018 through at least 2022, benefits in excess of $10,000 under a Federal program, including Medicare and Medicaid. Hospital A issued payments to vendors that provided goods and services to the hospital through a computerized vendor payment system. Hospital A maintained bank accounts at Bank D, which was located in Illinois.

    b. Defendant ANOSH AHMED was employed by Hospital A between in or around December 2017 and March 26, 2021, serving as the hospital's Chief Operating Officer (COO) and, between in or around July 2018 and the end of his employment, as the hospital's Chief Financial Officer (CFO). As CFO, AHMED was a senior executive responsible for managing Hospital A's finances, including its

Finance, Accounting, and Accounts Payable Departments. As COO, AHMED was second in command to the Chief Executive Officer and was responsible for the hospital's day-to-day operations. AHMED was also the owner and operator of a company named Global Healthcare Consulting Group LLC ("Global Healthcare"). AHMED maintained bank accounts at Bank B in his name and the names of entities he controlled.

       c.    Defendant SAMEER SUHAIL was a medical doctor who owned and operated multiple medical supply and service entities, including American International Clinical Group Ltd., and Shenzhen Medical Supplies. SUHAIL maintained bank accounts at Bank A in his name and the names of entities he controlled.

       d.    Defendant HEATHER BERGDAHL was employed by Hospital A as the hospital's Chief Transformation Officer and a supervisor of the hospital's Accounts Payable Department from on or about February 23, 2020 through in or around March 2022, and continued as an agent of Hospital A until on or about April 12, 2022. BERGDAHL's responsibilities at Hospital A included reviewing and approving invoices and bills for payment; submitting requests for vendor payments; paying invoices and bills; requesting, generating, issuing and printing checks for payment for goods and services; and processing credit card payments for goods and services. BERGDAHL maintained bank accounts at Bank C in her name and the names of entities she controlled.

e.     Defendant GEORGE MILLER, JR. was the Chief Executive Officer at Hospital A from on or about November 1, 2017 to on or about April 12, 2022. As CEO, MILLER was the highest ranking executive at Hospital A, and his responsibilities included making major corporate decisions, supervising other executives, managing operations and resources, and acting as the main point of communication between the board of directors and corporate operations. MILLER maintained bank accounts at Bank D in his name.

f.     Employee B was employed by Hospital A in its Accounts Payable Department. Employee B's responsibilities included issuing checks to Hospital A vendors based on vendor payment requests submitted through the hospital's computerized vendor payment system and as directed by BERGDAHL.

g.     Individual C was an associate of AHMED who lived in Texas and who was the owner and operator of Vendor C, an entity registered in Texas.

h.     Individual D was an associate of AHMED, BERGDAHL, and MILLER, who performed a variety of tasks, including tasks at Hospital A, at the direction of AHMED and BERGDAHL.

2.     Beginning no later than in or around April 2018 and continuing to at least in or around May 2022, in the Northern District of Illinois, and elsewhere,

ANOSH AHMED,
SAMEER SUHAIL, and
HEATHER BERGDAHL,

defendants herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud, and

3

to obtain money and funds owned by and under the custody and control of, Hospital A, by means of materially false and fraudulent pretenses, representations and promises, as further described below.

3.     It was part of the scheme that AHMED, SUHAIL, and BERGDAHL (the "defendants"), for the purpose of obtaining more than approximately $15 million in Hospital A funds, prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A requests for vendor payments, which requests falsely and fraudulently, among other things: (1) represented that Hospital A owed each purported vendor payment for goods and services that Hospital A had in fact not received, (2) directed those payments to entities controlled by one or more of the defendants, and (3) caused Hospital A to issue payments consistent with the requests submitted through the hospital's computerized vendor payment system, including payments issued by Employee B.

4.     It was further a part of the scheme that, in order to conceal the scheme to defraud, AHMED, SUHAIL, and BERGDAHL created and caused to be created fictitious documents, including fictitious invoices, payment requests, delivery receipts and other documents, which contained false information about goods and services provided by entities associated with AHMED, SUHAIL, BERGDAHL, Individual C, and Individual D, and false information about goods and services purportedly provided to Hospital A.

### *Creation of Fictitious Vendor Names and*
### *Fictitious Vendor Bank Accounts*

5. It was further part of the scheme that SUHAIL and AHMED created numerous additional names for existing companies ("doing business as" names, or "DBA" names) that they respectively owned and controlled and added those additional names to bank accounts that each opened and controlled, knowing that they would submit, and cause to be submitted, false and fraudulent payment requests to Hospital A in the names of those companies. SUHAIL and AHMED created these additional company names to conceal their association with the companies and the fraudulently obtained payments that they would receive from Hospital A. Specifically:

a. SUHAIL created DBA and assumed names for existing companies and bank accounts that he owned and controlled, including: Vitality Medical Solutions, Adventhealth Solutions, Comprehensive Medical Group, HospitalConsulting USA LLC, ECG Partners, Elite Medical Personnel, Unified Wellness Specialists, Westside Med Consultants, Maximum Healthcare Solutions, Inc., Mint Staffing Agency, Austin Outpatient Pharmacy, Allegra Pharmaceuticals, Women's Health Solutions, Industrial Emergency Products, Premier Chicago Health Group, Renaissance Medical Group, Westside EMS Supplies, Allied Protective Equipment, Westside EMS Supplies, Midwest Medline Supplies Inc., Superior Medical, Medpro Healthcare Staffing, TherapeuticsMD, Converge Biotech, CoreRX, and Optimum Bioscience (together, the "Fictitious Suhail Vendors"); and

5

b. AHMED opened and controlled four business bank accounts in the name of an existing entity which he controlled, to which he added to the accounts the names of additional purported entities, including: Medlabs USA, Chicago Promotions Ltd., Illinois Biotech Co., and Midwest Medical Supplies (together, the "Fictitious Ahmed Vendors").

6. It was further part of the scheme that AHMED and BERGDAHL caused Individual D, who did handyman projects at a property leased and subsequently owned by AHMED ("Ahmed Property"), to incorporate a company in Ohio called "Mideast Contractors," knowing that they would submit, and cause to be submitted, false and fraudulent payment requests to Hospital A in the name of Mideast Contractors. AHMED and BERGDAHL caused Individual D to incorporate as Mideast Contractors for the purpose of concealing from Hospital A Individual D's association with any requests for payment and invoices submitted to Hospital A for work purportedly performed by Mideast Contractors.

7. It was further part of the scheme that BERGDAHL opened bank accounts in the names of two legitimate Hospital A vendors (Vendors A and B) and registered a sole proprietorship in Texas under the name of each Hospital A Vendor, knowing that she would submit false and fraudulent payment requests to Hospital A in the names of those legitimate vendors and thereafter deposit those payments into bank accounts that she controlled. BERGDAHL opened these bank accounts in the names of Vendors A and B because she wanted to conceal her association with the

fraudulently obtained proceeds and to make Hospital A believe that those payments were directed to legitimate Hospital A vendors.

### *Issuance of Hospital A Payments Based on Fraudulent Vendor Payment Requests*

### *Suhail Payments*

8.     It was further part of the scheme that, between in or about September 2020 and February 2022, SUHAIL and BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, requests for payments to the Fictitious Suhail Vendors, which requests falsely and fraudulently represented that each Fictitious Suhail Vendor had provided goods or services to Hospital A.  SUHAIL and BERGDAHL knew at the time that the Fictitious Suhail Vendors had not provided any goods or services to Hospital A.  As a result of these vendor payment requests, SUHAIL and BERGDAHL caused Hospital A to transfer at least approximately $11.4 million into various SUHAIL-controlled bank accounts, on behalf of Fictitious Suhail Vendors, including:

       a.     approximately $177,394 to Vitality Medical Solutions;

       b.     approximately $27,990 to Adventhealth Solutions;

       c.     approximately $63,999 to Comprehensive Medical Group;

       d.     approximately $222,000 to HospitalConsulting USA LLC;

       e.     approximately $294,137 to ECG Partners;

       f.     approximately $325,382 to Elite Medical Personnel;

       g.     approximately $73,481 to Unified Wellness Specialists;

       h.     approximately $71,999 to Westside Med Consultants;

i.     approximately $3,021,035 to Maximum Healthcare Solutions, Inc.;

j.     approximately $270,604 to Mint Staffing Agency;

k.     approximately $3,661,709 to Austin Outpatient Pharmacy;

l.     approximately $72,899 to Allegra Pharmaceuticals;

m.     approximately $127,093 to Women's Health Solutions;

n.     approximately $19,800 to Industrial Emergency Products;

o.     approximately $257,998 to Premier Chicago Health Group;

p.     approximately $127,199 to Renaissance Medical Group;

q.     approximately $155,817 to Westside EMS Supplies;

r.     approximately $867,574 to Allied Protective Equipment;

s.     approximately $29,899 to Westside EMS Supplies;

t.     approximately $155,983 to Midwest Medline Supplies Inc.;

u.     approximately $88,428 to Superior Medical;

v.     approximately $255,577 to Medpro Healthcare Staffing;

w.     approximately $117,918 to TherapeuticsMD;

x.     approximately $183,003 to Converge Biotech;

y.     approximately $319,999 to CoreRX; and

z.     approximately $423,824 to Optimum Bioscience.

9.     It was further part of the scheme that, between in or about April 2020 and March 2021, AHMED, SUHAIL, and BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, multiple false

invoices, which falsely and fraudulently represented that SUHAIL-affiliated entities had provided goods or services to Hospital A. AHMED, SUHAIL and BERGDAHL knew at the time that the SUHAIL-owned companies identified in the invoices had not provided Hospital A the goods or services identified in those invoices and were not entitled to the requested payments. As a result of their submission of these false invoices and fraudulent vendor payment requests, AHMED, SUHAIL and BERGDAHL caused Hospital A to transfer more than approximately $3.6 million into one or more SUHAIL-controlled bank accounts, including:

      a.    approximately $985,000 to American International Clinical Group Ltd.; and

      b.    approximately $2.7 million to Shenzhen Medical Supplies.

    10.    It was further part of the scheme that, in or around April 2021 and in response to an internal hospital inquiry into the hospital's payments to Shenzhen Medical Supplies, AHMED and BERGDAHL falsely represented that Shenzhen had delivered medical supplies, including representations made in emails and other documents that were provided or caused to be provided to Hospital A employees and auditors. AHMED and BERGDAHL knew at the time that Shenzhen had not delivered medical supplies to Hospital A as described in their representations.

    11.    It was further part of the scheme, between in or about May 2021 and January 2022, AHMED, SUHAIL and BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, requests to pay approximately $34,000 in credit card charges made for the purchase of four copier

machines and related products from Copier Company A, which requests falsely and fraudulently represented that BERGDAHL had purchased the copier machines and related products for the benefit of Hospital A. AHMED, SUHAIL and BERGDAHL knew at the time that BERGDAHL had in fact purchased the copier machines and related products for the personal use and benefit of SUHAIL and AHMED and had the copiers delivered to various properties controlled by SUHAIL in Illinois and AHMED in Texas. As a result of these payment requests, AHMED, SUHAIL and BERGDAHL caused Hospital A to pay approximately $34,000 to a credit card company for copiers and related products provided to AHMED and SUHAIL.

### *Ahmed Payments*

12.     It was further part of the scheme that, between on or about June 11, 2021, and November 29, 2021, AHMED and BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, at least 11 requests for payments to the Fictitious Ahmed Vendors, which requests falsely and fraudulently represented that each Fictitious Ahmed Vendor had provided goods and services to Hospital A. AHMED and BERGDAHL knew at the time that the Fictitious Ahmed Vendors had not provided any goods or services to Hospital A. As a result of these vendor payment requests, AHMED and BERGDAHL caused Hospital A to transfer more than $486,000 into various AHMED-controlled bank accounts, by way of approximately 11 Hospital A checks made payable to four Fictitious Ahmed Vendors, including transferring:

    a.     approximately $196,949 to Medlabs USA;

    b.     approximately $89,999 to Chicago Promotions;

   c.  approximately $121,825 to Illinois Biotech; and

   d.  approximately $77,764 to Midwest Medical Supplies.

  13.  It was further part of the scheme that, between on or about August 14, 2020, and on or about December 31, 2021, AHMED and BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, approximately 19 requests for payment to Individual D's company, Mideast Contractors, which requests falsely and fraudulently represented that Mideast Contractors had provided goods or services to Hospital A in the amount represented by the payment request. BERGDAHL also caused to be submitted to Hospital A an invoice which made false representations about contractor work purportedly done by Mideast Contractors. AHMED and BERGDAHL knew at the time that Mideast Contractors had not provided any goods or services to Hospital A, and instead knew that Individual D was performing handyman services for AHMED at the Ahmed Property. As a result of these vendor payment requests, AHMED and BERGDAHL caused Hospital A to transfer approximately $92,285 to Mideast Contractors and Individual D.

### *Bergdahl Payments*

  14.  It was further part of the scheme that, between in or about October 2020 and March 2022, BERGDAHL prepared and submitted to Hospital A at least 16 requests for payments to Vendors A and B, which requests falsely and fraudulently represented that Hospital A owed each vendor money for goods or services. BERGDAHL knew at the time that Vendors A and B had not requested and were not owed the requested amounts and that she intended to keep the requested payments

for herself. As a result of these vendor payment requests, BERGDAHL caused Hospital A to transfer more than $56,690 into three BERGDAHL-controlled bank accounts, by way of approximately 16 Hospital A checks made payable to Vendors A and B, including:

a. approximately 15 checks totaling approximately $46,690 made payable to Vendor A; and

b. approximately one check in the amount of approximately $10,000 made payable to Vendor B.

### *Vendor C Payments*

15. It was further part of the scheme that, between on or about May 1, 2020, and on or about March 15, 2021, BERGDAHL prepared and submitted to Hospital A, and caused to be prepared and submitted to Hospital A, duplicate requests to pay Vendor C for services purportedly provided to Hospital A, which requests falsely and fraudulently represented that Vendor C was owed money for services that Vendor C already had been paid for. BERGDAHL knew at the time that Hospital A had already issued payment for the services on which each request was based and that Vendor C was not entitled to additional payment. As a result of these false and fraudulent requests, BERGDAHL caused Hospital A to transfer approximately $158,400 in duplicate payments into Individual C-controlled bank and credit accounts, on behalf of Vendor C.

16. It was further part of the scheme that, to conceal the duplicate payments to Vendor C, BERGDAHL caused Hospital A to use two different methods of payment,

namely, monthly payments by way of both Hospital A checks and payments to a credit card processing account opened in the name of Vendor C.

17.     It was further part of the scheme that, to conceal the duplicate payments to Vendor C, BERGDAHL falsely and fraudulently (a) recorded the payments as expenses incurred by Hospital A's Human Resources department; (b) recategorized the expenses as incurred under Hospital A's general business account when confronted about the expenses by a Human Resources employee; and (c) misrepresented the total amount of Hospital A money paid to Vendor C when questioned about the payments by Hospital A's general counsel, disclosing only the total amount of Hospital A checks issued to Vendor C in 2021 and nothing about the checks issued in 2020 or the monthly credit card payments made to the company in 2020 and 2021.

### *Disposition of Fraud Proceeds*

18.     It was further part of the scheme that, through the submission of the false and fraudulent vendor payment requests, AHMED, SUHAIL, and BERGDAHL caused Hospital A to transfer and pay more than approximately $15,000,000 in proceeds from Hospital A into bank accounts that the defendants controlled, which proceeds the defendants obtained for their personal use and benefit.

19.     It was further a part of the scheme that through the submission of false and fraudulent vendor payments, AHMED and BERGDAHL caused Hospital A to transfer hospital proceeds into bank accounts controlled by Individuals C and D, and Individuals C and D used proceeds for their own personal benefit.

20.    It was further part of the scheme that AHMED, SUHAIL, and BERGDAHL transferred proceeds of the scheme to each other and to their associates, including MILLER.

21.    It was further part of the scheme that AHMED, SUHAIL, and BERGDAHL misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

22.    On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, listed below, each such writing, sign, and signal constituting a separate count:

| Count | Defendants | Date | Writing, Sign, and Signal |
|-------|-----------|------|---------------------------|
| One | ANOSH AHMED, SAMEER SUHAIL, and HEATHER BERGDAHL | April 10, 2020 | a wire transmission of approximately $102,350 from Bank D to Bank A, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Shenzhen Medical Supplies, Ltd. |
| Two | HEATHER BERGDAHL | May 15, 2020 | a wire transmission of approximately $14,400 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Vendor C |

| Count | Defendants | Date | Writing, Sign, and Signal |
|-------|-----------|------|---------------------------|
| Three | ANOSH AHMED, SAMEER SUHAIL, and HEATHER BERGDAHL | July 31, 2020 | a wire transmission of approximately $150,000 from Bank D to Bank A, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Shenzhen Medical Supplies, Ltd. |
| Four | ANOSH AHMED, SAMEER SUHAIL, and HEATHER BERGDAHL | August 31, 2020 | a wire transmission of approximately $90,000 from Bank D to Bank A, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Shenzhen Medical Supplies, Ltd. |
| Five | SAMEER SUHAIL and HEATHER BERGDAHL | October 9, 2020 | a wire transmission of approximately $48,930.20 from Bank D to Bank A, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Unified Wellness Specialists |
| Six | HEATHER BERGDAHL | October 16, 2020 | a wire transmission of approximately $10,000 from Bank D to Bank C, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Vendor B |
| Seven | SAMEER SUHAIL and HEATHER BERGDAHL | January 21, 2021 | a wire transmission of approximately $30,299 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Allegra Pharmaceuticals |

| Count | Defendants | Date | Writing, Sign, and Signal |
|---|---|---|---|
| Eight | SAMEER SUHAIL and HEATHER BERGDAHL | March 10, 2021 | a wire transmission of approximately $30,127 from Bank D to Bank D, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Optimum Bioscience |
| Nine | ANOSH AHMED and HEATHER BERGDAHL | June 14, 2021 | a wire transmission of approximately $149,999.99 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Medlabs USA |
| Ten | ANOSH AHMED and HEATHER BERGDAHL | June 15, 2021 | a wire transmission of approximately $54,888.99 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Midwest Medical Supplies USA |
| Eleven | ANOSH AHMED and HEATHER BERGDAHL | August 23, 2021 | a wire transmission of approximately $15,082.60 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Medlabs USA |
| Twelve | ANOSH AHMED and HEATHER BERGDAHL | August 23, 2021 | a wire transmission of approximately $29,999.99 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Chicago Promotions |

| Count | Defendants | Date | Writing, Sign, and Signal |
|-------|-----------|------|---------------------------|
| Thirteen | ANOSH AHMED and HEATHER BERGDAHL | December 2, 2021 | a wire transmission of approximately $27,825.99 from Bank D to Bank B, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Illinois Biotech |
| Fourteen | HEATHER BERGDAHL | March 7, 2022 | a wire transmission of approximately $8,678 from Bank D to Bank C, processed through servers located outside the state of Illinois, which funds represented the proceeds of a Hospital A check issued to Vendor A |

In violation of Title 18, United States Code, Section 1343.

## COUNTS FIFTEEN THROUGH TWENTY-FOUR

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

1.     The allegations of paragraphs 1(a) through (d) of Counts One through Fourteen are incorporated here.

2.     On or about the dates set forth below, at Chicago, in the Northern District of Illinois, and elsewhere, the defendants, as set forth below, each being an agent of Hospital A, embezzled, stole, obtained by fraud and otherwise without authority knowingly converted to the use of a person not the rightful owner, and intentionally misapplied, property worth at least $5,000 and owned by and under the care, custody and control of Hospital A, namely, payments issued by Hospital A in the following amounts, with each payment constituting a separate count:

| Count | Defendants | Date | Payment |
|-------|-----------|------|---------|
| Fifteen | ANOSH AHMED and HEATHER BERGDAHL | April 10, 2020 | approximately $102,350 through a check made payable to Shenzhen Medical Supplies, Ltd. |
| Sixteen | HEATHER BERGDAHL | May 08, 2020 | approximately $14,400 through a check made payable to Vendor C |
| Seventeen | ANOSH AHMED and HEATHER BERGDAHL | July 31, 2020 | approximately $150,000 through a check made payable to Shenzhen Medical Supplies, Ltd. |
| Eighteen | ANOSH AHMED and HEATHER BERGDAHL | August 28, 2020 | approximately $6,240 through a check made payable to Mideast Contractors |
| Nineteen | ANOSH AHMED and HEATHER BERGDAHL | August 31, 2020 | approximately $90,000 through a check made payable to Shenzhen Medical Supplies, Ltd. |

18

| Count | Defendants | Date | Payment |
|---|---|---|---|
| Twenty | HEATHER BERGDAHL | October 9, 2020 | approximately $48,930.20 through a check made payable to Unified Wellness Specialists |
| Twenty-One | HEATHER BERGDAHL | October 16, 2020 | approximately $10,000 through a check made payable to Vendor B |
| Twenty-Two | HEATHER BERGDAHL | January 21, 2021 | approximately $30,299 through a check made payable to Allegra Pharmaceuticals |
| Twenty-Three | HEATHER BERGDAHL | March 10, 2021 | approximately $30,127 through a check made payable to Optimum Bioscience |
| Twenty-Four | HEATHER BERGDAHL | March 3, 2022 | approximately $8,678 through a check made payable to Vendor A |

In violation of Title 18, United States Code, Section 666(a)(1)(A); and

2.     On or about the dates set forth above, at Chicago, in the Northern District of Illinois, and elsewhere,

SAMEER SUHAIL,

defendant herein, did knowingly aid and abet the offenses set forth in Counts Fifteen, Seventeen, Nineteen, Twenty, Twenty-Two, and Twenty-Three;

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

19

## COUNTS TWENTY-FIVE THROUGH THIRTY-FIVE

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

1.      The allegations of paragraphs 1(a), (b), and (d) of Counts One through Fourteen are incorporated here.

2.      On or about the dates set forth below, at Chicago, in the Northern District of Illinois, and elsewhere,

HEATHER BERGDAHL,

defendant herein, being an agent of Hospital A, embezzled, stole, obtained by fraud and otherwise without authority knowingly converted to the use of a person not the rightful owner, and intentionally misapplied, property worth at least $5,000 and owned by and under the care, custody and control of Hospital A, namely, payments issued by Hospital A in the following amounts, with each payment constituting a separate count:

| Count | Date | Payment |
|---|---|---|
| Twenty-Five | June 11, 2021 | approximately $149,999.99 through a check made payable to Medlabs USA |
| Twenty-Six | June 12, 2021 | approximately $29,999.99 through a check made payable to Chicago Promotions |
| Twenty-Seven | June 15, 2021 | approximately $79,999.99 through a check made payable to Illinois Biotech |
| Twenty-Eight | June 15, 2021 | approximately $54,888.99 through a check made payable to Midwest Medical Supplies |
| Twenty-Nine | August 23, 2021 | approximately $15,082.60 through a check made payable to Medlabs USA |

| Count | Date | Payment |
|-------|------|---------|
| Thirty | August 23, 2021 | approximately $29,999.99 through a check for made payable to Chicago Promotions |
| Thirty-One | August 23, 2021 | approximately $13,999.98 through a check made payable to Illinois Biotech |
| Thirty-Two | November 29, 2021 | approximately $31,866.78 through a check made payable to Medlabs USA |
| Thirty-Three | November 29, 2021 | approximately $29,999.99 through a check made payable to Chicago Promotions |
| Thirty-Four | November 29, 2021 | approximately $27,825.99 through a check made payable to Illinois Biotech |
| Thirty-Five | November 29, 2021 | approximately $22,875.99 through a check made payable to Midwest Medical Supplies |

In violation of Title 18, United States Code, Section 666(a)(1)(A); and

3.      On or about the dates set forth above, at Chicago, in the Northern District of Illinois, and elsewhere,

ANOSH AHMED,

defendant herein, did knowingly aid and abet these offenses;

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT THIRTY-SIX

The SPECIAL JANUARY 2023 GRAND JURY further charges:

1.      The allegations of paragraphs 1(a) through (c), 1(e), and 1(h) of Counts One through Fourteen are incorporated here.

2.      At times material to the indictment:

a.      Defendants AHMED and MILLER were authorized by Hospital A to award and approve contracts on behalf of the hospital, including contracts in which vendors agreed to provide goods and services to Hospital A in exchange for money.

b.      Defendants AHMED and MILLER were authorized by Hospital A to award business on behalf of the hospital, including business for purchases of necessary and reasonable services.

c.      Defendant SUHAIL created or caused to be created, and owned and/or operated multiple medical supply and service entities, including:

i.      One Health Billing Co. ("One Health"), incorporated in Delaware in or around September 2018;

ii.      Pan Optic Imaging LLC ("Pan Optic"), registered as an Illinois foreign corporation on or about June 11, 2018; and

iii.      SKS Healthcare Management Group Ltd. ("SKS HMG"), incorporated in Illinois on or about February 19, 2019.

2.      Beginning in or around October 2018, and continuing through in or around March 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED,<br>
SAMEER SUHAIL, and<br>
GEORGE MILLER,

defendants herein, did knowingly conspire:

a.      to corruptly solicit and demand, and to accept and agree to accept from another person, namely SUHAIL, things of value, including checks and money transfers, for the benefit of AHMED and MILLER, agents of Hospital A, intending that AHMED and MILLER be influenced in connection with any business, transaction, and series of transactions of Hospital A involving things of value of $5,000 or more, namely, the award of Hospital A contracts and other business to SUHAIL-affiliated entities and the payment of Hospital A proceeds to SUHAIL and his affiliated entities purportedly for goods and services, in violation of Title 18, United States Code, Section 666(a)(1)(B); and

b.      to corruptly give, offer, and agree to give things of value, including checks and money transfers, for the benefit of AHMED and MILLER, with the intent to influence AHMED and MILLER, as agents of Hospital A, in connection with any business, transaction, and series of transactions of Hospital A involving things of value of $5,000 or more, namely, the award of Hospital A contracts and other business to SUHAIL-affiliated entities and the payment of Hospital A proceeds to SUHAIL and his affiliated entities for purported goods and services, in violation of Title 18, United States Code, Section 666(a)(2).

23

## Manner and Means of the Conspiracy

3.     It was part of the conspiracy that, for the purpose of influencing AHMED and MILLER in connection with the award of Hospital A contracts and other business to SUHAIL-affiliated entities and causing Hospital A to issue Hospital A vendor payments to SUHAIL and his affiliated entities, SUHAIL agreed to provide AHMED and MILLER with things of value, including money transfers and checks.

4.     It was further part of the conspiracy that, in or before October 2018, SUHAIL agreed to pay AHMED a portion of the profits for Hospital A business, including contracts, that AHMED caused Hospital A to award to SUHAIL and his affiliated entities.

5.     It was further part of the conspiracy that AHMED advised MILLER about SUHAIL's agreement to pay AHMED a portion of the profits for Hospital A contracts and business that AHMED and MILLER awarded to SUHAIL and his affiliated entities, and AHMED agreed to pay MILLER a portion of the payments from SUHAIL in exchange for MILLER's help and agreement in (a) awarding, approving and concealing Hospital A contracts and business to SUHAIL-affiliated entities, and (b) facilitating continued payments to the SUHAIL-affiliated entities.

6.     It was further part of the conspiracy that AHMED and MILLER agreed to use their positions at Hospital A to award Hospital A contracts and other business to SUHAIL-affiliated entities, and to facilitate regular payments to the SUHAIL-affiliated entities.

7.    It was further a part of the conspiracy that AHMED and MILLER agreed to use their positions at Hospital A to award contracts and business to SUHAIL-affiliated entities without putting those contracts or business up for bids from competing vendors, obtaining competing proposals and pricing, considering appropriate market prices for the goods and services obtained through those contracts, or assessing the experience and ability of the SUHAIL-affiliated entities to provide goods or services that met Hospital A's needs.

8.    It was further part of the conspiracy that AHMED agreed to use his position at Hospital A to facilitate the issuance of Hospital A vendor payments to SUHAIL and his affiliated entities, including American International Clinical Group Ltd. and Shenzhen Medical Supplies.

9.    It was further part of the conspiracy that AHMED and MILLER concealed from the Hospital A Board members and other employees of Hospital A that SUHAIL was the source of multiple contracts and business, that the payments for each entity were payments to SUHAIL, the total amounts of the payments to SUHAIL, and that AHMED and MILLER had conflicts of interest with regard to those contracts and business.

10.    It was further part of the conspiracy that, between October 15, 2018 and June 1, 2019, AHMED and MILLER caused to be awarded three contracts to SUHAIL-affiliated entities. These contracts included:

a.    a contract with One Health dated October 15, 2018, pursuant to which One Health was to provide billing, claim management, and collection services

25

to Hospital A for an indefinite period absent either party's termination notice, for a payment from Hospital A of 5.25% of the collections, which was amended on or about June 1, 2019 to increase the percentage that Hospital A paid to One Health for collections from 5.25% to 6%, and established the term of the contract as five years with an automatic renewal provision.

b.    a contract with Pan Optic dated April 15, 2019, for a 10-year lease and purchase agreement, which was automatically renewable for five-year terms absent termination notice, pursuant to which Pan Optic leased magnetic resonance imaging ("MRI") equipment to Hospital A.

c.    a contract with SKS HMG dated June 1, 2019, for a three-year, automatically renewable term, pursuant to which SKS HMG was to provide administrative and management services for Hospital A's laboratory services.

11.    It was further part of the conspiracy that, as a result of the contracts that they awarded to three SUHAIL-affiliated entities, AHMED and MILLER caused Hospital A to transfer at least $19,000,000 into various SUHAIL-controlled bank accounts, including:

a.    a total of approximately $8.3 million paid to One Health between approximately October 2018 and October 2021;

b.    a total of approximately $1.6 million paid to Pan Optic and approximately $200,000 to entities associated with Pan Optic, between approximately October 2018 and February 2022; and

c.      a total of approximately $6.1 million paid to SKS HMG between approximately June 2019 and March 2022.

12.     It was further part of the conspiracy that SUHAIL prepared and submitted and caused to be prepared and submitted to Hospital A multiple invoices requesting payments to American International Clinical Group Ltd. and Shenzhen Medical Supplies, for goods and services that Hospital A had in fact not received.  As a result of these vendor payment requests, Hospital A paid approximately $3,685,000 to SUHAIL-controlled entities, including:

a.      a total of approximately $985,000 paid to American International Clinical Group Ltd. between approximately April 2020 and March 2021; and

b.      a total of approximately $2.7 million paid to Shenzhen Medical Supplies between approximately April 2020 and September 2020.

13.     It was further part of the conspiracy that, for the purpose of  influencing AHMED in connection with the Hospital A contracts, business and payments that AHMED and MILLER awarded to SUHAIL-affiliated entities, including One Health, Pan Optic, SKS HMG, American International Clinical Group Ltd., and Shenzhen Medical Supplies, SUHAIL paid AHMED a portion of the profits for each Hospital A contract, business, or payment that AHMED and MILLER awarded to SUHAIL and a portion of the profits for other SUHAIL-affiliated entities, in an amount totaling millions of dollars.

14.     It was further part of the conspiracy that, after receiving payments from SUHAIL in exchange for awarding Hospital A contracts and business and payments

27

to SUHAIL-affiliated entities, AHMED paid MILLER a portion of the funds he received from SUHAIL, including:

      a.      a total of approximately $700,000 paid directly to MILLER; and

      b.      a total of approximately $69,000 paid to MILLER through Individual D.

15.    It was further part of the conspiracy that, for the purpose of influencing MILLER in connection with MILLER's role in facilitating awards of Hospital A contracts, business, and payments to SUHAIL-affiliated entities, SUHAIL made payments directly to MILLER in 2021 totaling approximately $7,300.

16.    It was further part of the conspiracy that AHMED and MILLER caused Hospital A to pay approximately $19.6 million to One Health, Pan Optic, SKS HMG, American International Clinical Group Ltd., and Shenzhen Medical Supplies.

17.    It was further part of the conspiracy that AHMED, SUHAIL, and MILLER and their co-conspirators misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, and attempted to misrepresent, conceal and hide acts done in furtherance of the conspiracy and the purpose of those acts.

## Overt Acts

18.    It was further part of the conspiracy that AHMED, SUHAIL, MILLER, and their co-conspirators committed and caused to be committed one or more overt acts, within the Northern District of Illinois and elsewhere, in furtherance of and to affect the objects of the conspiracy, including but not limited to the following:

a.      On or about October 15, 2018, AHMED and MILLER approved and awarded a contract to One Health, in which One Health agreed to provide billing, claim management, and collection services to Hospital A in exchange for approximately 5.25% of the collections, with an indefinite term until notice of termination.

b.      On or about November 28, 2018, SUHAIL wire transferred approximately $194,818 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8574 controlled by AHMED.

c.      On or about November 29, 2018, AHMED issued a check payable to MILLER in the amount of $375, from a Bank B account ending in 8529 that AHMED controlled and held in the name of Global Healthcare Consulting Group.

d.      On or about February 7, 2019, SUHAIL wire transferred approximately $73,782 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8529 controlled by AHMED.

e.      On or about February 8, 2019, AHMED issued a check payable to MILLER, in the amount of $11,000, from a Bank B account ending in 8529 that AHMED controlled and held in the name of Global Healthcare Consulting Group.

f.      On or about March 1, 2019, SUHAIL made two wire transfers, each in the amount of $1,900, from a Bank A account ending in 9898 controlled by SUHAIL to a Bank A account ending in 8205 controlled by MILLER.

g.      On or about April 15, 2019, AHMED and MILLER approved and awarded a contract to Pan Optic, pursuant to which Pan Optic leased magnetic

resonance imaging ("MRI") equipment to Hospital A for a ten-year period with a purchase option, which was automatically renewable for five-year terms absent termination notice, and pursuant to which Hospital A agreed to pay Pan Optic a rental rate of $325 for each MRI scan.

h.     On or about May 7, 2019, SUHAIL wire transferred approximately $79,500 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8529 controlled by AHMED.

i.     On or about May 8, 2019, AHMED issued a check payable to MILLER, in the amount of approximately $10,000, from a Bank B account ending in 8529 that AHMED controlled and held in the name of Global Healthcare Consulting Group.

j.     On or about June 1, 2019, AHMED and MILLER approved and awarded a contract to SKS HMG, pursuant to which SKS HMG was to provide administrative and management services for Hospital A's laboratory services for a three-year, automatically renewable term, and pursuant to which Hospital A agreed to pay SKS HMG $1,300,000 per year.

k.     On or about June 1, 2019, AHMED and MILLER approved and awarded an amended contract to One Health, increasing the payment due to One Health from 5.25% to 6% of collections, and setting a contract term of five years with an automatic renewal provision.

l.     On or about June 5, 2019, AHMED sent a text message to MILLER, providing MILLER with updated amounts that MILLER would receive

each month, including $5,000 a month related to Hospital A's payments to One Health; $2,000 a month related to Hospital A's payments to American International Clinical Group Ltd.; $1,000 a month related to Hospital A's payments to Pan Optic; and $4,000 a month related to Hospital A's payments to SKS.

m.     On or about August 12, 2019, SUHAIL wire transferred approximately $108,000 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8529 controlled by AHMED.

n.     On or about August 15, 2019, AHMED issued a check payable to MILLER in the amount of approximately $7,000, from a Bank B account ending in 8529 controlled by AHMED.

o.     On or about July 16, 2020, SUHAIL wire transferred approximately $72,728 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8529 controlled by AHMED.

p.     On or about July 20, 2020, AHMED issued a check payable to MILLER in the amount of approximately $10,000, from a Bank B account ending in 8529 controlled by AHMED.

q.     On or about January 7, 2021, SUHAIL wire transferred approximately $76,000 from a Bank A account ending in 9898 controlled by SUHAIL to a Bank B account ending in 8529 controlled by AHMED.

r.     On or about January 7, 2021, AHMED issued a check made payable to MILLER, in the amount of approximately $8,750, from a Bank B account

31

ending in 8529 that AHMED controlled and held in the name of Global Healthcare Consulting Group.

s. On or about April 9, 2021, SUHAIL wire transferred approximately $3,500 from Bank A account ending in 8950 controlled and held by SUHAIL in the name of Meridien Physician Group, PLCC to Bank A account ending in 8205 controlled by MILLER.

t. On or about April 28, 2021, in response to an email from a Hospital A employee alerting MILLER that Hospital A's auditors were asking for verification that Hospital A received goods in the amounts reflected on Shenzhen Medical Supplies invoices, MILLER stated "We have the inventory, I will sign that documents that we have that amount of inventory."

All in violation of Title 18, United States Code, Section 371.

## COUNTS THIRTY-SEVEN THROUGH FORTY-TWO

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants, as set forth below, knowingly conducted and attempted to conduct the following financial transactions listed below, namely, the transfer of United States currency from one bank account to another bank account, in or affecting interstate and foreign commerce, each such financial transaction constituting a separate count, which financial transactions involved the proceeds of a specified unlawful activity, namely, wire fraud and embezzlement, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting such financial transactions, the defendant knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity:

| Count | Defendant | Date | Financial Transaction |
|---|---|---|---|
| Thirty-Seven | HEATHER BERGDAHL | October 19, 2020 | a transfer of approximately $7,500 from an account held in the name of Heather Bergdahl dba Vendor B ending in 5327 at Bank C to an account in the name of Heather L. Bergdahl ending in 3313 at Bank C |
| Thirty-Eight | ANOSH AHMED | June 22, 2021 | a transfer of approximately $30,900 from Gold Oak Capital dba Chicago Promotions account ending in 0103 at Bank B to a Gold Oak Capital Account ending in 8845 at Bank B |

33

| Count | Defendant | Date | Financial Transaction |
|---|---|---|---|
| Thirty-Nine | ANOSH AHMED | June 22, 2021 | a transfer of approximately $81,050 from Gold Oak Capital dba Illinois Biotech account ending in 1584 at Bank B to a Gold Oak Capital Account ending in 8845 at Bank B |
| Forty | ANOSH AHMED | June 23, 2021 | a transfer of approximately $151,000 Gold Oak Capital dba Medlabs account ending in 2358 at Bank B to Gold Oak Capital Account ending in 8845 at Bank B |
| Forty-One | SAMEER SUHAIL | March 11, 2021 | a transfer of approximately $30,000 from a bank account at Bank A ending in 8081 held in the name of TherapeuticsMD Solutions, Inc. dba CoreRX, Converge Biotech and Optimum Bioscience to a bank account at Bank A ending in 9300 held in the name of United Healthcare Investment Group |
| Forty-Two | SAMEER SUHAIL | March 12, 2021 | a transfer of approximately $31,000 from a bank account at Bank A ending in 8081 held in the name of TherapeuticsMD Solutions, Inc. dba CoreRX, Converge Biotech and Optimum Bioscience to a bank account at Bank A ending in 9300 held in the name of United Healthcare Investment Group |

In violation of 18 United States Code Section 1956(a)(1)(B)(i).

## COUNT FORTY-THREE

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

On or about April 10, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED,

defendant herein, willfully made and subscribed a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2018, which return was verified by a written declaration that it was made under penalties of perjury, and filed with the Internal Revenue Service, which return defendant did not believe to be true and correct as to every material matter, in that defendant falsely represented and stated on said return:

      a.    On Form 1040, line 6, that the total income was $647,256, when defendant knew and believed that his total income substantially was in excess of the amount reported on the return; and

      b.    On Form 1040, line 15, that the total tax was $195,876, when defendant knew and believed that the total tax owed exceeded that amount;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FORTY-FOUR

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

On or about June 25, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED,

defendant herein, willfully made and subscribed a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2019, which return was verified by a written declaration that it was made under penalties of perjury, and filed with the Internal Revenue Service, which return defendant did not believe to be true and correct as to every material matter, in that defendant falsely represented and stated on said return:

a. On Form 1040, line 7b, that the total income was $728,651, when defendant knew and believed that his total income was in excess of the amount reported on the return; and

b. On Form 1040, line 16, that the total tax was $217,883, when defendant knew and believed that the total tax owed exceeded that amount;

In violation of Title 26, United States Code, Section 7206(1).

## **COUNT FORTY-FIVE**

The SPECIAL JANUARY 2023 GRAND JURY further charges that:

On or about October 15, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED,

defendant herein, willfully made and subscribed a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2020, which return was verified by a written declaration that it was made under penalties of perjury, and filed with the Internal Revenue Service, which return defendant did not believe to be true and correct as to every material matter, in that defendant falsely represented and stated on said return:

a.      On Form 1040, line 9, that the total income was $995,110, when defendant knew and believed that his total income substantially was in excess of the amount reported on the return; and

b.      On Form 1040, line 24, that the total tax was $309,154, when defendant knew and believed that the total tax owed exceeded that amount;

In violation of Title 26, United States Code, Section 7206(1).

## <u>FORFEITURE ALLEGATION ONE</u>

The SPECIAL JANUARY 2023 GRAND JURY further alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 1343, as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C), and any property traceable to such property, as provided in Title 18, United States Code, Section 982(a)(1).

2.     The property to be forfeited includes, but is not limited to, a personal money judgment in the amount of approximately $15,912,375.

3.     If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

## <u>FORFEITURE ALLEGATION TWO</u>

The SPECIAL JANUARY 2023 GRAND JURY further alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), as set forth in this Indictment, defendant shall forfeit to the United States of America any property involved in such offense, and any property traceable to such property, as provided in Title 18, United States Code, Section 982(a)(1).

2,      If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

## FORFEITURE ALLEGATION THREE

The SPECIAL JANUARY 2023 GRAND JURY further alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Section 371, conspiracy to violate Title 18 United States Code, Sections 666(a)(1)(B) and 666(a)(2), as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.     The property to be forfeited includes, but is not limited to, a personal money judgment.

3.     If any of the property described above, as a result of any act or omission by a defendant:  cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:


_____

FOREPERSON

40